

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| JAMES EDWARD ROSENBAUM and | § | Case No. 08-43029 |
| SANDRA ALICE ROSENBAUM, | § | (Chapter 7) |
| | § | |
| Debtors. | § | |
| | § | |
| | § | |
| C.L. GAGE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. Proc. No. 09-4023 |
| | § | |
| JAMES EDWARD ROSENBAUM and | § | |
| SANDRA ALICE ROSENBAUM, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

This matter is before the court following trial of the plaintiff's adversary complaint. The plaintiff seeks a judgment liquidating his claims against the debtors for common law fraud, statutory fraud under the Texas Business and Commerce Code, shareholder oppression, violation of the Texas Theft Liability Act, and breach of fiduciary duty. Further, the plaintiff seeks his attorneys' fees, exemplary damages, pre- and post-judgment interest, and a judgment determining that his liquidated claim is nondischargeable in bankruptcy pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(2)(B), (a)(4) and (a)(6). The parties agreed at trial that the plaintiff's request for his attorneys' fees would be determined at a separate hearing in the event he established a nondischargeable claim against the debtors. The following constitutes the Court's findings of fact and

conclusions of law regarding the merits of the plaintiff's claims.  *See* FED. R. BANKR. P.

7052.

## I. Findings of Fact

James and Sandra Rosenbaum filed a petition for relief under Chapter 7 of the

Bankruptcy Code on November 10, 2008.  In their bankruptcy schedules and statements,

they listed their occupations as "retired," and they reported that their only income was

from social security.  They disclosed their interest in Cornerstone Ag Products, a Texas

corporation, which they valued at $0.  However, the Rosenbaums received approximately

$40,000 from Cornerstone during 2009.  Cornerstone filed a separate petition for relief

under Chapter 7 of the Code on January 19, 2010.

James Rosenbaum has a bachelor's degree in animal husbandry.  After graduating

from college in the 1960s, he tried his hand at various fields, including insurance sales

and apartment maintenance.  His stint in the insurance industry led to significant legal

difficulties during the 1970s.  He was, in his words, "broke" for a number of years.

James Rosenbaum's luck began to turn when he founded a company called Rubber

Material, Inc. ("RMI"), in the 1990s.  In addition, he and several investors, including C.L.

Gage, were involved in a partnership called "Velox" in the late 1990s.

In 1996, the Rosenbaums purchased a tract of land known as the High Meadows

Ranch.  They lived on the ranch and raised goats for the purpose of selling them on the

market, among other things.  They employed at least three men to work part-time on the

ranch, and their daughter, Jennifer, occasionally helped her parents with their ranch and

other business ventures.  Jennifer had held a variety of jobs since graduating from a local

college with a degree in hospitality merchandising.  Her parents paid her mortgage and other bills on those occasions when she was between jobs or employed only part-time.

Although Velox did not produce any income for James Rosenbaum, he obtained a significant sum as a result of his ownership interest in RMI.  In or around 2000, James Rosenbaum sold part of his interest in RMI to one or more of the existing shareholders. He traded the remainder of his interest in RMI to one or more of the existing shareholders in exchange for a loan from the company.  James Rosenbaum then embarked on his next business venture – the sale of a goat de-wormer known as Positive Pellets to commercial distributors.

Rumatel is the active ingredient in Positive Pellets.  On or about July 26, 2001, James Rosenbaum arranged for a business known as American Superior to receive 4,000 pounds of Rumatel at a price of $126,400.  He arranged for American Superior to receive another 4,000 pounds at the same price a few months later.  Phibro Animal Health U.S., Inc., which manufactured Rumatel as a goat and cattle de-wormer, delivered the Rumatel to Bluebonnet Milling Co. in Ardmore, Oklahoma, on both occasions.  After mixing the Rumatel with food pellets that goats could ingest, Bluebonnet Milling Co. transferred the completed product to Cornerstone's warehouse in Gainesville, Texas.

James Rosenbaum created Cornerstone on August 22, 2001, and is its president and majority shareholder.[1]  His wife, Sandra, and his daughter, Jennifer, are also officers of the company.  Sandra and James ran the company together.  In addition, Cornerstone

---

[1] Cornerstone has issued a total of 2,657,000 shares.  Cornerstone issued 1,860,000 of these shares to Rosenbaum, for a 70% interest in the company.

paid their daughter, Jennifer, approximately $1,000 each month (plus health insurance) for her assistance with Cornerstone's advertising and marketing.[2]

Sandra Rosenbaum kept at least two sets of books and records for Cornerstone. Sandra kept some of Cornerstone's books and records at the warehouse, such as the records relating to payroll. However, she kept information regarding the payments she was making from Cornerstone's bank account at her home. Many of these payments were to herself, her husband, her daughter, and the three ranch hands who also did some work at Cornerstone's warehouse. The payments she made from Cornerstone's account were not always reflected in the books and records kept at Cornerstone's office, which often showed that there was money in the bank account when, in fact, there was nothing.

On September 1, 2001, Phibro entered into a Distributorship Agreement with Cornerstone under which Cornerstone became the exclusive distributor of Rumatel on a "goat specific" label only. James Rosenbaum negotiated the Distributorship Agreement for Cornerstone, and he understood that Cornerstone was receiving the exclusive right to distribute Rumetel as a goat de-wormer. Contrary to his understanding, the Distributorship Agreement expressly stated that other distributors could sell Rumatel under multiple-use labels, which could include, by reference or otherwise, goat uses.

After entering into the Distributorship Agreement, Cornerstone ordered only one additional shipment of Rumatel from Phibro. Phibro delivered the Rumatel to Bluebonnet, and Bluebonnet delivered the blended product to Cornerstone. Cornerstone had no liquid assets and no way to pay for the three shipments of Rumatel it had received.

---

[2] Jennifer Rosenbaum was the secretary/treasure of Cornerstone and a member of its board of directors. Jennifer designed magazine advertisements for Cornerstone as well as pamphlets for distribution at goat shows. She also created and maintained a website for Cornerstone, among other things. According to her deposition testimony, Jennifer used her pay stubs to report her income to the IRS.

4

The plaintiff, C.L. Gage, has known the Rosenbaums since the early 1990s. In October 2001, James Rosenbaum approached Gage about investing in Cornerstone. He told Gage that Cornerstone had the exclusive right to distribute Rumatel for goat uses. Rosenbaum told Gage that he had made a lot of money from his previous business, RMI, and that Cornerstone was similarly poised to make a lot of money for its shareholders. In order to induce Gage to invest in Cornerstone, he told him that he would not be withdrawing a salary from Cornerstone. Instead, James Rosenbaum told Gage that he expected to be compensated through his interest in Cornerstone as a majority shareholder. James Rosenbaum specifically represented that he and Gage would be partners in profit. These statements and representations were false.

Rosenbaum told Gage that he already had acquired the Rumatel necessary to make goat de-wormer. Indeed, Gage visited Cornerstone's warehouse and saw that it was filled with bags of goat de-wormer. Rosenbaum told Gage that Cornerstone lacked the funds necessary to distribute the de-wormer to customers. Rosenbaum's statements and representations to Gage were false inasmuch as Cornerstone had not paid for the Rumatel in Cornerstone's warehouse, Rosenbaum had no intention of investing the funds necessary to pay the outstanding invoices into Cornerstone, and Gage's investment would be used to pay for some of the Rumatel – not to pay distribution costs.

In November 2001, Gage paid $252,800 for 505,000 shares of Cornerstone. Gage understood that the funds would be used to get Cornerstone up and running. However, James and Sandra Rosenbaum actually used Gage's money to satisfy the outstanding invoices from Phibro for the first two shipments of Rumatel. The amount of Gage's check exactly matched the total amount of the invoices for the first two shipments.

Rosenbaum testified that he told Gage that Gage's first check would be used to pay outstanding invoices to Phibro. Under Rosenbaum's version of events, Gage agreed to front all the funds necessary for Cornerstone's acquisition of the Rumatel in exchange for a minority stake in a business that did not have the funds necessary to distribute the product or operate. Rosenbaum's testimony contradicted Gage's testimony. Having observed the demeanor of the witnesses in Court and considered their testimony, the Court finds that James Rosenbaum's testimony on this point was *not* credible and that Gage's testimony to the contrary *was* credible.

In early January 2002, James Rosenbaum approached Gage for an additional $71,600 investment in Cornerstone. In a letter dated January 9, 2002, James Rosenbaum provided Gage with a list of how the funds would be used, including advertising, the purchase of smaller containers for the de-wormer, "two months of deficit cash flow because of such a rapid growth and expansion of the company," the hiring of two new employees, and general operating expenses. Gage agreed to provide the requested funds.

Gage wrote a check to Cornerstone dated January 15, 2002 in the amount of $71,600. He received a second stock certificate from Cornerstone for an additional 152,000 shares, bringing his ownership interest to 25% of the company. Immediately after receiving the funds from Gage, the Rosenbaums deposited the funds into Cornerstone's bank account. On January 17, 2002, Sandra Rosenbaum wrote a check for $15,000 from that account to her husband and another check for $16,000 to herself. The Rosenbaums used an additional $7,000 as a "capital return" to another investor, Melvin Dixon.

Contrary to James Rosenbaum's representation that he would not be taking a salary from Cornerstone, in the six months prior to receiving the second check from Gage, the Rosenbaums had withdrawn more than $85,000 from Cornerstone for their personal benefit, and they withdrew an additional $200,000 over the next year. James Rosenbaum's testimony that Gage knew all about these withdrawals was not credible or supported by any evidence – such as a contract for employment or board meeting minutes. The Court finds, as a matter of fact, that Gage was unaware of the withdrawals by James and Sandra Rosenbaum for what they have variously described as their salaries, payments for their contract labor, loans from Cornerstone, shareholder distributions, or payments to themselves as creditors of Cornerstone. Sandra's practice of keeping at least two separate books and records relating to Cornerstone's business ensured that Gage would not discover their self-dealing even if he went to Cornerstone's office to examine the records located there.

After investing in Cornerstone, Gage began to notice advertisements by various companies that, like Cornerstone, were selling goat de-wormer with Rumatel as the active ingredient. He brought these advertisements to the attention of James Rosenbaum, who told him that he was taking action against these companies for infringing on his distribution rights. James Rosenbaum also told Gage and another minority investor, Pam Womack, that Cornerstone was suing Phibro for violating the Distribution Agreement. Gage and Womack learned later that, in fact, Phibro had initiated litigation against Cornerstone over the unpaid invoice for the third shipment of Rumatel.

In particular, in June 2003, Phibro filed a lawsuit against Cornerstone in federal district court. Phribo sought to recover $140,000 from Cornerstone for the third shipment

of Rumetel received by Cornerstone in November 2001.  Rosenbaum did not deny that Cornerstone received the Rumatel in question.  However, he took the position that Cornerstone was not required to pay Phibro for the outstanding invoice in light of Phibro's alleged breach of the Distribution Agreement, among other things.

While the lawsuit with Phibro was pending, in December 2003, Cornerstone entered into a Supply and Marketing Agreement with Manna Pro Corporation, a Kansas corporation.  Manna Pro was engaged in the business of buying, selling, marketing and distributing animal feed products.  Cornerstone agreed to sell Manna Pro its existing inventory of Rumatel, and Manna Pro agreed to purchase from Cornerstone all of Manna Pro's total requirements for Rumatel for use in producing goat de-wormer.  Manna Pro paid $192,929.65 to Cornerstone on January 20, 2004.  Beginning January 20, 2004 and continuing through April 23, 2004, Sandra Rosenbaum issued checks from Cornerstone's account to her husband, her daughter, and herself totaling $100,950.

Cornerstone did not enter into any written labor contracts or salary agreements with James, Sandra, or Jennifer Rosenbaum.  Gage did not know that Sandra Rosenbaum was writing checks to herself, her husband, and her daughter from Cornerstone's bank account.  Gage's testimony was particularly credible in light of the fact that James and Sandra Rosenbaum also failed to disclose their income from Cornerstone to the Internal Revenue Service, their accountant, or their Chapter 7 trustee.

James Rosenbaum testified that the funds they had received from Cornerstone were compensation for "doing all the work."  In their opening statements to this Court, however, the Rosenbaums represented that all of the funds they received from

8

Cornerstone, which totaled more than $600,000 over approximately six years, were loans. Cornerstone's books and records do not reflect any loans to the Rosenbaums.

The evidence reflects that as money came into Cornerstone's account, the Rosenbaums paid a few of Cornerstone's bills, and then they paid whatever was left to themselves. Sandra sometimes wrote checks to herself or her husband for labor. Sandra Rosenbaum also paid herself various amounts for "contract labor." Some of the checks stated that the funds were a "loan." During 2005 and 2006, Sandra wrote checks from Cornerstone to herself for "household." During 2005, Sandra also wrote checks to herself to cover "ranch" expenses.

Pam Womack, a minority shareholder for Cornerstone who handled Cornerstone's payroll and related reports for several years, testified, credibly, that she told Sandra that Cornerstone needed to issue IRS Form 1099s to all contract laborers – including James and Sandra Rosenbaum and their daughter. Pam Womack further testified, credibly, that Sandra did not want to issue Form 1099s, because she did not want to have to recognize the funds they had received as income. Significantly, none of the Rosenbaums actually had a labor contract with Cornerstone. Moreover, none of the Rosenbaums obtained board approval for their insider dealing as required by Cornerstone's bylaws.

The Rosenbaums retained Stanley F. Seat, C.P.A., to prepare a report and testify at trial. Although Seat is a certified fraud examiner, the Rosenbaums did not ask him to review Cornerstone's bylaws, bank records or general ledger for purposes of determining whether fraud or embezzlement occurred. Rather, the Rosenbaums asked him to testify solely on the issue of comparative compensation.

9

According to Seat's analysis, the services rendered by Sandra Rosenbaum from 2001 – 2004 were worth $243,000 in compensation, and the services rendered by James Rosenbaum were worth $350,516. Seat characterized the payments actually received by James and Sandra Rosenbaum during this period as payments for contract labor based on his discussions with the Rosenbaums. His conclusion that the payments received by the Rosenbaums were for contract labor was also based, in part, on the fact that Cornerstone's records did not show any loans or shareholder distributions to the Rosenbaums.

The Court did not find Seat's analysis helpful or persuasive. Seat used companies engaged in veterinary service and animal care to form his opinion on comparative compensation. Cornerstone was not engaged in either of these lines of business. Despite the fact that the Rosenbaums asked him to focus on Cornerstone's highest-earning years – 2001 through 2004 – the companies used by Seat in his compensation analysis had significantly more income than Cornerstone.

Seat's analysis was also limited by his reliance upon unverified representations by the Rosenbaums about what they did for Cornerstone. For example, Sandra Rosenbaum represented to Seat, and Seat relied upon her representation that, she worked full-time for Cornerstone, kept its book and records, and supervised Cornerstone's day-to-day operations, among other things.[3] These representations were not supported by the evidence at trial. At trial, Sandra testified that she worked only a couple days a week. (Her testimony regarding her work schedule was corroborated by the credible testimony

---

[3] According to the information provided by the Rosenbaums to their expert, Sandra kept Cornerstone's checking account, paid Cornerstone's bills and invoices, handled Cornerstone's correspondence, represented Cornerstone at agricultural shows, selected products for donations to goat shows, mailed products Cornerstone donated to goat shows, decided when and where to advertise the business, and oversaw the hourly employees and day-to-day operations of the business.

of Pam Womack.)  Sandra also admitted at trial that her bookkeeping responsibilities primarily consisted of writing checks to the utility providers, herself, and her family members.  Sandra has attended only one semester of community college, and her trial testimony reflected that she lacks the most rudimentary knowledge one would expect of a bookkeeper – such as how to prepare IRS Form 1099s and W2s.

James Rosenbaum also provided Seat with an exaggerated description of his work for Cornerstone.  James, like Sandra, only visited Cornerstone's offices occasionally.  His work for Cornerstone included recruiting potential distributors through telephone calls, correspondence, and travel.  James Rosenbaum attended goat shows on the weekends during certain times of the year, and he testified that he was involved in research and development inasmuch as he was always looking for something unique to bring into the goat market.  However, most of his "work" for Cornerstone involved pursuing fruitless and legally untenable claims against Phibro.  James Rosenbaum also managed to find time to run his ranch and, in 2006, to start up an unrelated automobile business called American Auto Biz, Inc.

Cornerstone did not observe corporate formalities such as board meetings.  Gage occasionally visited Cornerstone's warehouse and spoke with James Rosenbaum about the business.  However, Gage was unaware of Cornerstone's agreement with Manna Pro.  Gage was not involved in Cornerstone's daily operations, and he never received a dividend or other payment from Cornerstone.

In September 2006, Phibro obtained a summary judgment on its claims against Cornerstone in federal district court.  The district court dismissed all of Cornerstone's counterclaims against Phibro.  The total amount of the judgment, as amended on

February 8, 2007, was $420,430.43 plus post-judgment interest.  Cornerstone appealed to the Third Circuit, which entered an order affirming the district court's judgment on March 26, 2008.

It is not clear from the record when Gage first asserted legal claims against the Rosenbaums.  In or around December 2006, Gage brought suit against Cornerstone and James and Sandra Rosenbaum in Texas state court.  The parties engaged in extensive discovery, including depositions of James and Jennifer Rosenbaum.  The Rosenbaums filed for bankruptcy protection on the eve of the scheduled trial.

In their bankruptcy schedules, which they signed under penalty of perjury, the Rosenbaums list an undisputed debt owed to Gage in the amount of $375,000.  Gage subsequently filed proof of a claim against them in the amount of $1,159,852.41 plus post-petition attorneys' fees.  The Rosenbaums object to the allowance of Gage's proof of claim, asserting that the claim is "untrue," and seek its complete disallowance.

### III. Conclusions of Law

A proceeding seeking a determination of the dischargeability of a debt raises a core matter over which this Court has jurisdiction to enter a final order.  *See* 28 U.S.C. §§ 157(b)(2)(I) and 1334.

#### A. Liquidation of Gage's Claim

As an initial matter, Gage requests this Court to liquidate his claims against James and Sandra Rosenbaum for minority shareholder oppression, breach of fiduciary duty, common law fraud, statutory fraud, and theft.  *See Morrison v. Western Builders of Amarillo, Inc. (In re Morrison)*, 555 F.3d 473, 478-79 (5th Cir. 2009).  Gage seeks to recover his principal investment in Cornerstone in the total amount of $324,400.  In

addition, Gage seeks to recover punitive damages in the amount of twice his original investment, his reasonable and necessary attorneys' fees, and other costs under TEX. BUS. & COMM. CODE § 27.01.

### 1. Shareholder Oppression

With respect to Gage's claim for minority shareholder oppression, there is no set standard for determining whether shareholder oppression has occurred. *See Davis. Davis v. Sheerin,* 754 S.W.2d 375, 382 (Tex. App. -- Houston [1st Dist.] 1988, writ denied). Rather, the Court must examine the facts as a whole and determine whether the corporation's conduct has deprived a minority shareholder of the shareholder's reasonable expectations as an equity holder of the corporation. *Id.* at 382-83. The challenged conduct or transaction must be intrinsically fair when self-dealing is involved. *See* TEX. BUS. COMM. CODE § 21.418(b)(1) (addressing contracts and transactions involving interested officers).

Texas courts take a broad view of the application of oppressive conduct to a closely-held corporation such as Cornerstone. *See Davis,* 754 S.W.2d at 381. Here, the evidence shows that minority shareholder oppression occurred.

Sandra and James Rosenbaum acted in concert, and together they dominated control of Cornerstone. They induced Gage to invest in the business by misrepresenting its assets as well as their intent to use Gage's investment to grow the business. They then proceeded to furtively raid all of Cornerstone's assets, leaving the minority shareholders with stock in a company that was worthless. These were purposeful actions to dilute the value of Gage's investment while employing the business and its assets solely for their own benefit. *See generally Duncan v. Lichtenberger,* 671 S.W.2d 948, 953 (Tex. App. --

13

Fort Worth 1984, writ ref'd n.r.e.) (citing *Patton v. Nicholas,* 154 Tex. 385, 279 S.W.2d 848 (1955), regarding lowering of minority's share value). The Rosenbaums' conduct was certainly "oppressive" inasmuch as their practice of transferring substantially all of Cornerstone's assets to themselves defeated Gage's expectations which, when objectively viewed, were both reasonable under the circumstances and central to his decision to purchase shares in Cornerstone. *See Willis v. Bydalek,* 997 S.W.2d 798, 801 (Tex. App. - Houston [1st Dist.] 1999, pet. denied) (citing *Davis,* 754 S.W.2d at 381-82).

2. Breach of Fiduciary Duty

Gage also claims that James and Sandra Rosenbaum had a fiduciary duty to him, which they breached. "[A] co-shareholder in a closely held corporation does not as a matter of law owe a fiduciary duty to his co-shareholder." 971 S.W.2d 472, 488 (Tex. App. -- Houston [14th Dist .] 1997, pet. denied). Rather, the existence of such a duty depends on the circumstances. *Pabich v. Kellar,* 71 S.W.3d 500, 504-05 (Tex. App. -- Fort Worth 2002, pet. denied). For example, a fiduciary duty exists if a confidential or "informal" relationship exists. *Id.* at 505; *In re Estate of Fawcett,* 55 S.W.3d 214, 220 (Tex. App. -- Eastland 2001, pet. den.). In addition, a fiduciary relationship may exist in certain circumstances in which a majority shareholder in a closely held corporation dominates control over the business, *Hoggett,* 971 S.W.2d at 488 n. 13, and in closely held corporations in which the shareholders "operate more as partners than in strict compliance with the corporate form." *DeBord v. Circle Y of Yoakum, Inc.,* 951 S.W.2d 127, 133 (Tex. App. -- Corpus Christi 1997), *rev'd on other grounds,* 967 S.W.2d 352 (Tex. 1998).

14

Here, the Court finds and concludes that James and Sandra Rosenbaum owed a fiduciary duty to Gage.  They dominated control of Cornerstone, as previously discussed, and they did not operate Cornerstone in compliance with the corporate form.  They used Cornerstone as their personal piggy bank.  The Court further finds and concludes that the Rosenbaums breached their fiduciary duty to Gage for the same reasons their conduct was oppressive.

### 3. Common Law Fraud and Statutory Fraud

Gage also asserts claims against James and Sandra Rosenbaum for fraud and statutory fraud.  Under Texas law, a plaintiff alleging fraud must establish (1) a material misrepresentation; (2) which was false; (3) which was either known to be false when made or was asserted without knowledge of its truth; (4) which was intended to be acted upon; (5) which was relied upon; and (6) which caused injury.  *See Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex. 1998). The elements of statutory fraud in the sale of stock are substantially the same, except that to recover actual damages for false statements of fact, a plaintiff does not have to prove that the defendant knew a statement was false, *see* TEX. BUS. COMM. CODE § 27.01(a), (c).  *See also Swanson v. Schlumberger Technology Corp.,* 895 S.W.2d 719, 732 (Tex. App. -- Texarkana 1995), *rev'd on other grounds,* 959 S.W.2d 171 (Tex. 1997).  In order to establish fraud or statutory fraud, a plaintiff is not required to show that he exercised due diligence to discover whether the representations were fraudulent.  *See Koral Indus. v. Security-Conn Life Ins. Co.,* 802 S.W.2d 650, 651 (Tex. 1990).

Here, James Rosenbaum's misrepresentations to Gage regarding the exclusivity of Cornerstone's agreement with Phibro appear to have arisen from his genuine

misunderstanding of that agreement rather than a reckless disregard of the truth. However, he deliberately misrepresented Cornerstone's financial health as well as how Cornerstone would use Gage's investments in the company.   James Rosenbaum concealed the fact that the de-wormer in Cornerstone's warehouse was not yet paid for, leading Gage to believe that the Rosenbaums had already made a significant financial contribution to the business.   Sandra Rosenbaum actively participated in and benefited from this fraud, which was carried out through James and Sandra Rosenbaum's domination of Cornerstone.

The Rosenbaums deliberately misrepresented their intent to operate Cornerstone as a business for the profit of all shareholders.   They misrepresented their intention to withdraw salaries.   They also deliberately misrepresented their intent to withdraw money from the business for their personal benefit.

The Rosenbaums concealed their systematic sweeping of cash from Cornerstone's bank account for their personal benefit.   This concealment was accomplished, in part, by their practice of keeping more than one set of books for Cornerstone.   The records they kept at Cornerstone's office misrepresented Cornerstone's financial condition since these records did not show all of the money paid to insiders.   James Rosenbaum also accomplished this concealment by leading Gage to believe, among other things, that he had made a lot of money from RMI and did not need to draw a salary from Cornerstone.

With respect to Gage's initial investment in Cornerstone, the Rosenbaums did not disclose that Cornerstone had no means to pay Phibro for the goat de-wormer it had received, or that Gage's money would only be enough to pay two of the outstanding invoices.   With respect to the solicitation of an additional $71,600 from Gage, the

16

Rosenbaums never had any intention of allowing Cornerstone to use the funds for additional advertising or to hire new employees. Their intent to siphon off money for their personal use is evident from their immediate use of nearly half of the funds they obtained from Gage in January 2002 to pay themselves. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 229, 304 (Tex. 2006). James Rosenbaum's testimony that Gage knew all about these withdrawals was not credible or supported by any evidence. The Court finds, as a matter of fact, that Gage was unaware of the withdrawals by James and Sandra Rosenbaum for what they have variously described as their salaries, payments for their contract labor, loans from Cornerstone, or shareholder distributions.

Under Texas law, a promise of future performance constitutes actionable fraud if "the promise was made with no intention of performing at the time it was made." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex. 1998). James and Sandra Rosenbaum solicited Gage to invest in Cornerstone without any intention of allowing him to profit from his investment – or even to recover the principal amount of his investment. Except for a $3,000 "capital replacement" and a $7,000 "capital return" paid to Melvin Dixon, James and Sandra Rosenbaum appear to be the only shareholders who received dividends or profit distributions from Cornerstone. Their characterization of the monies they withdrew from Cornerstone's account as loans was not supported by the record evidence. Likewise, the checks Sandra wrote to herself and her husband far exceeded any reasonable salaries or payments for contract labor.

The Court concludes that Gage has established a claim for fraud and statutory fraud under Texas law. The Rosenbaums made material misrepresentations to Gage and omitted material facts in order to induce him to purchase shares in Cornerstone. The

Rosenbaums knew their representations were false at the time they made them. They never had any intention using Gage's investment to grow Cornerstone's business. They never had any intention of establishing Cornerstone as a legitimate business. Rather, they intended to use Cornerstone to fund their lifestyle until Cornerstone ran out of Rumatel. Gage reasonably relied on the Rosenbaums' false representations and suffered injury as a result.

The Court further concludes that Gage has established actual damages arising from the Rosenbaums' shareholder oppression, breach of fiduciary duty, and fraud in the amount of $324,000, which is the sum the Rosenbaums fraudulently induced him to pay for stock in Cornerstone. Gage is also entitled to an award of his reasonable attorneys' fees and costs pursuant to TEX. BUS. & COM. CODE § 27.01(3). As previously discussed, the Court will determine the reasonable amount of Gage's attorneys' fees following a separate evidentiary hearing.

With respect to Gage's request for pre-judgment interest, Texas law allows such an award based on general principles of equity. *See Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 531 (Tex. 1998). *See generally* 28 TEX. JUR. 3d Damages § 208. Pre-judgment interest is "compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 552 (Tex. 1985). Here, the Court finds and concludes that general principles of equity support the award of pre-judgment interest.

Under Texas common law, pre-judgment interest begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim or (2) the date

18

suit is filed. *See Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 531 (Tex. 1998). In this case, pre-judgment interest begins to accrue on July 1, 2007, which is 180 days after Gage filed suit against the Rosenbaums in Texas state court.[4] An equitable award of pre-judgment interest accrues at the rate for post-judgment interest under Texas law (currently 5%),[5] and it is computed as simple interest. *Id.*

Equitable principles, however, do not support an award of exemplary damages under Tex. Bus. Comm. Code § 27.01, which states that such damages "may" be awarded in an appropriate case. This is not an appropriate case. The Rosenbaums are already bankrupt, they appear to have little in the way of non-exempt assets, and such an award would not appear to serve any deterrent effect.

<u>4. Theft</u>

Gage's claim for theft arises under the Texas Theft Liability Act, *see* Tex. Pen. Code §§ 31.03, Tex. Civ. Prac & Rem. Code § 134.005(a). Gage argues that the Rosenbaums committed theft by taking money from Cornerstone. However, Gage has not asserted a claim to pierce Cornerstone's corporate veil. Cornerstone is not a plaintiff in this action, and Gage has not addressed his standing to bring a theft claim on Cornerstone's behalf – especially in light of Cornerstone's own bankruptcy and the appointment of a Chapter 7 trustee to oversee the liquidation of Cornerstone's assets. The Court, therefore, finds and concludes that Gage has failed to establish a claim against James and Sandra Rosenbaum for theft.

---

[4] The record reflects that Gage filed suit in December 2006, but the exact date is not in evidence. The Court, therefore, assumes that Gage filed suit on December 31, 2006.
[5] *See* Tex. Fin. Code § 304.003(b). The current rate is published by the Office of Consumer Credit Commissioner at and is available at http://www.occc.state.tx.us/pages/int_rates/Index.html.

**B. Dischargeability of Gage's Claim**

In an action to determine the dischargeability of a debt, the creditor has the burden of proof under a preponderance of the evidence standard. *See Grogan v. Garner*, 498 U.S. 279, 286 (1991). "Intertwined with this burden is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start." *Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997). Thus, without satisfactory proof of each element of the cause of action, judgment must be entered for the Rosenbaums.[6]

**1. Plaintiff's § 523(a)(2)(A) Count**

Section 523(a)(2) provides that:

> A discharge under section 727 ... of this title does not discharge an individual debtor from any debt for money, property services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A). For a debt to be non-dischargeable under § 523(a)(2)(A), "the creditor must show (1) that the debtor made a representation; (2) that the debtor knew the representation was false; (3) that the representation was made with the intent to deceive the creditor; (4) that the creditor actually and justifiably relied on the representation; and (5) that the creditor sustained a loss as a proximate result of its reliance." *General Elec. Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir. 2005) (citing *AT&T*

---

[6] In jointly filed cases, § 524(a)(3) of the Bankruptcy Code "contemplates that joint debtors who did not engage in any conduct proscribed by § 523 will hold their after-acquired community property free from pre-petition community claims." *Valley Nat'l Bank of Arizona v. LeSueur (In re LeSueur)*, 53 B.R. 414, 416-417 (Bankr. D. Ariz. 1985). However, § 524(b) provides that the community property discharge does not apply if the debtor's spouse has had a discharge denied in the same case. In other words, "the Code's clear policy is that the economic sins of either spouse shall be visited upon the community when a discharge is denied." *Id. See generally* 4 COLLIER ON BANKRUPTCY ¶ 524.02[3] (15th ed. rev.).

20

*Universal Card Services v. Mercer (In re Mercer),* 246 F.3d 391, 403 (5th Cir. 2001)).

Debts that satisfy the third element, the scienter requirement, are debts obtained by frauds

involving "moral turpitude or intentional wrong, and any misrepresentations must be

knowingly and fraudulently made." *Id.* (quoting *First Nat'l Bank LaGrange v. Martin (In

re Martin),* 963 F.2d 809, 813 (5th Cir. 1992)).

Here, Gage has established a claim in the principal amount of $324,000, plus pre-

judgment interest and reasonable attorneys' fees, based on fraud and statutory fraud

under Texas law. The Rosenbaums induced Gage to invest in Cornerstone through

misrepresentation and concealment. In particular, the Rosenbaums deliberately

misrepresented that the de-wormer stored in Cornerstone's warehouse in November 2001

was an asset of the business. This representation was false inasmuch as Cornerstone had

not yet paid for the de-wormer and lacked the funds to do so. The Rosenbaums also

falsely represented that they would not take a salary from Cornerstone, and they

misrepresented the nature of the money they, in fact, withdrew from Conernstone's bank

account for their personal benefit. Gage had known the Rosenbaums for many years, he

had other business dealings with James Rosenbaum, and he actually and justifiably relied

upon the Rosenbaums representations by advancing funds to Cornerstone. The Court

concludes that Gage established, by a preponderance of the evidence, non-

dischargeability of these damages under § 523(a)(2)(A) of the Code.

### 2. Plaintiff's § 523(a)(2)(B) Claim

Section 523(a)(2)(B) provides that:

A discharge under section 727 ... of this title does not discharge an
individual debtor from any debt for money, property, services, or an
extension, renewal, or refinancing of credit, to the extent obtained by use
of a statement in writing (i) that is materially false; (ii) respecting the

debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(B).  All four of these elements are questions of fact "which the creditor must prove by a preponderance of the evidence."  *Norris v. First Nat'l Bank of Luling (In re Norris),* 70 F.3d 27, 29 (5th Cir. 1995).

Here, Gage failed to show that the Rosenbaums gave him a written statement of their financial condition or the financial condition of Cornerstone.  The only written statement they provided to Gage appears to have been the letter describing how Cornerstone intended to use the funds James Rosenbaum solicited from Gage in January 2002.  Any oral representations of the Rosenbaums respecting their financial condition or the financial condition of Cornerstone, true or false, are specifically excepted by the plain language of § 523(a)(2)(B).  The Court, therefore, finds that Gage's complaint must be denied as to the action pled under § 523(a)(2)(B).

### 3. Plaintiff's § 523(a)(4) Claim

Section 523(a)(4) provides that "[a] discharge under section 727 ... of this title does not discharge an individual debtor from any debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny." 11 U.S.C. § 523(a)(4).  To show non-dischargeability under § 523(a)(4) for fraud or defalcation, a creditor must prove by a preponderance of the evidence that (1) the debt was caused by fraud or defalcation, and (2) there was a fiduciary relationship between the parties at the time the debt was created.  *See, e.g., In re Chavez,* 140 B.R. 413, 422 (Bankr. W.D. Tex. 1992).

A fiduciary under § 523(a)(4) does not refer to *any* relationship involving confidence, trust or good faith.  The trust must exist "prior to the wrong and without

reference to it," *Angelle v. Reed (In re Angelle),* 610 F.2d 1335, 1340 (5th Cir. 1980), in order to constitute a "technical trust" within the non-dischargeability provision.   The Fifth Circuit has repeatedly concluded that debts arising from misappropriation by persons serving in a traditional, pre-existing fiduciary capacity, as understood by state law principles, are non-dischargeable.   Thus, the Fifth Circuit has held non-dischargeable debts of corporate officers to the corporation or a minority shareholder as well as the debts of a managing partner of a limited partnership to the limited partners.   *See, e.g., Moreno v. Ashworth (In re Moreno),* 892 F.2d 417, 421 (5th Cir. 1990); *LSP Inv. Partnership v. Bennett (In re Bennett),* 989 F.2d 779, 791 (5th Cir. 1993); *Sheerin v. Davis (In re Davis),* 3 F.3d 113, 117 (5th Cir. 1993).

Here, James and Sandra Rosenbaum engaged in actual fraud, as previously discussed, by convincing Gage to "invest" in Cornerstone.   The Rosenbaums also willfully neglected the fiduciary duty they owed to Gage as officers of the company and controlling shareholders.   This duty encompassed, at a minimum, a responsibility not to use Cornerstone as their personal piggy bank.   Their transfers of hundreds of thousands of dollars to themselves for their personal benefit had the effect of rendering Cornerstone worthless to Gage as well as Cornerstone's other minority shareholders.   *See In re Moreno*, 892 F.2d at 421.   The Rosenbaums knew, or reasonably should have known, that their actions violated their fiduciary duty to Cornerstone and its minority shareholders.   *See, e.g., Office of Thrift Supervision v. Felt (In re Felt)*, 255 F.3d 220, 226 (5th Cir. 2001) (discussing the standard for defalcation under § 523(a)(4)).

The Rosenbaums did not provide the Court with any loan agreements, promissory notes, or employment contracts in support of the checks they wrote to themselves from

Cornerstone's bank account.  The Rosenbaums did not report any taxable income from Cornerstone, and Cornerstone did not report any taxable loans or shareholder distributions to the Rosenbaums.  The Rosenbaums have not repaid any portion of the transfers they received from Cornerstone, and the transfers exceeded any reasonable compensation.  The Court finds and concludes that James and Sandra Rosenbaum willfully breached their fiduciary duty to Gage, a minority shareholder, by withdrawing money from Cornerstone for their benefit to the exclusion of Gage.  The Court further finds and concludes that the actions of James and Sandra Rosenbaum were the proximate cause of Gage's damages.  Gage established, by a preponderance of the evidence, non-dischargeability of these damages under § 523(a)(4) of the Code.

### 4. Plaintiff's § 523(a)(6) Claim

Section 523(a)(6)) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."  In the Fifth Circuit, a "willful and malicious injury" is established under § 523(a)(6) when there exists either: (1) an objective substantial certainty of harm arising from a deliberate or intentional action; or (2) there is a subjective motive to cause harm by a party taking a deliberate or intentional action.  *See Raspanti v. Keaty (In re Keaty)*, 397 F.3d 264, 271 (5th Cir. 2005).

Here, the Court has determined that James and Sandra Rosenbaum engaged in fraud and breached their fiduciary duty to Gage.  Sandra knowingly participated in her husband's fraud and benefitted from it.  By finding that James and Sandra Rosenbaum acted in concert to defraud Gage and breach their fiduciary duty to him, the Court has determined that their conduct was willful and malicious under § 523(a)(6).  Thus, the

Court concludes that Gage has established, by a preponderance of the evidence, the non-dischargeability of his claim against the Rosenbaums under § 523(a)(6) of the Code.

## IV. Conclusion

For the foregoing reasons, the Court concludes that the plaintiff has established a claim against the debtors in the principle amount of $324,400 plus pre-judgment interest at the rate of 5% beginning on July 1, 2007, plus reasonable attorneys' fees and costs. The Court further concludes that the plaintiff's claim against the debtors is non-dischargeable pursuant to §§ 523(a)(2)(A), (a)(4) and (a)(6) of the Code.  The Court will conduct a separate hearing on **June 23, 2010, at 2:00 p.m.** to determine the amount of the plaintiff's reasonable attorneys' fees and costs.

Signed on 5/7/2010

*Brenda T. Rhoades*   SR

HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE

25